THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STOKES LAWRENCE, P.S., <br><br> Plaintiff, <br><br> v. <br><br> BLOCK 24 SEATTLE LIMITED LP, <br><br> Defendant. | CASE NO. C12-1366-JCC <br><br> ORDER |

This matter comes before the Court on Plaintiff's motion for summary judgment. (Dkt. No. 12.) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for the reasons explained herein.

**I.  BACKGROUND**

The instant matter is a dispute regarding the interpretation of a specific provision in a commercial lease between Plaintiff Stokes Lawrence, P.S.—the tenant—and Defendant Block 24 Seattle Limited, LP ("Block 24")—the landlord. Plaintiff, a Seattle law firm, was a long-time tenant of the Bank of America Fifth Avenue Plaza in downtown Seattle, Washington. Plaintiff's prior lease, which expired in 2006, provided for its ability to extend that lease term for five years. When the time came to exercise its extension, however, Plaintiff and Defendant instead executed in March 2006 a new ten-year lease.  The new lease provided that Block 24 was to make

substantial payments on Plaintiff's behalf. Such expenditures included Plaintiff's broker's fee in negotiating the new lease, as well as a Cash Allowance of approximately $1.2 million that Plaintiff could either use to pay for improvements to the building within the first year of its new lease or apply as rent credits. Consistent with the agreement, Block 24 paid the $240,575.00 commission owed to Plaintiff's broker "at or prior to" the inception of the lease. (Dkt. No. 14 at 1.) Defendant also reimbursed Plaintiff for $195,268.67 in tenant improvements made within the first year of the new lease, and permitted Plaintiff to apply the remainder of the Cash Allowance as rent credits from July 2007 through January 2009. (Dkt. No. 14 at 1-2.)

Article 14.27(d) of the ten-year lease established that Plaintiff could terminate the lease after five years—specifically, at any time after May 31, 2011. (Dkt. No. 14, Ex. A.) According to that provision, Plaintiff was required to give sixty (60) days notice and the parties were to execute an amendment to the lease should Plaintiff choose to exercise its right to terminate the lease. Of particular importance here, Article 14.27(d) also established a "Reduction Premises Fee"—*i.e.*, a lease termination fee—which Plaintiff was obligated to pay in the event that it exercised its right to terminate the lease during the second half of the initial lease term. The provision, Article 14.27(d), defines the fee as equal to specific "transaction costs" paid by Defendant that are then "amortized at 8% interest over a five (5) year term." (Dkt. No. 14, Ex. A, Art. 14.27(d).) The provision in full reads as follows:

> At least sixty (60) days prior to the Reduction Date, (i) the parties shall execute an amendment to this Lease to document the reduction in the Premises, and (ii) Tenant shall pay Landlord in cash a fee (the "Reduction Premises Fee") equal to (A) *the unamortized transaction costs* attributable to the Reduction Premises, consisting of *the Cash Allowance* and *the leasing commission paid to Tenant's Broker*, and (B) the entire unpaid balance of the Additional Allowance and any interest accrued thereon through the date the Reduction Premises Fee is paid in full. *Such transaction costs shall be amortized at 8% over a five (5) year term.*

(Dkt. No. 14, Ex. A, Art. 14.27(d)) (emphasis added.)

The parties agree that if Plaintiff terminated the lease, the fee for which it would be responsible under Article 14.27(d) would decrease over time pursuant to a five year amortization schedule

ORDER
PAGE - 2

using an eight percent interest rate. Nor is there is any dispute that Plaintiff exercised its option to completely reduce the premises—*i.e*., terminate the lease—by providing notice to Block 24 on November 10, 2011 of its intention to fully vacate the space as of August 31, 2012.  The parties dispute, however, which five years of the ten year period constitute "a five year term" for purposes of calculating the amortization of the transaction costs. Accordingly, the parties have reached an impasse regarding the fee that Plaintiff owes Defendant as a result of its lease termination effective August 31, 2012.

      Plaintiff asserts that based on the language of the lease and nothing more, the five year term is triggered the moment Defendant expended the funds (*i.e.*, transaction costs) at issue. Under this interpretation, for example, the Cash Allowance used by Plaintiff as a rent credit during year three of the lease would begin amortizing on the five year schedule at that moment; it would thus fully amortize and equal zero in year eight. If Plaintiff terminated the lease during year five (as it was permitted to do), the fee would include those costs after two years of amortization, resulting in a fee less than the full amount expended by Defendant. Following the example through, if Plaintiff terminated the lease in year eight, those transaction costs would have fully amortized over the five year period, and any Reduction Premises Fee would not include those transaction costs. As a more concrete example, the Court notes that the broker's fee initially paid by Defendant was paid "at or prior to" the inception of the lease. (Dkt. No. 14 at 2.) Thus, according to Plaintiff, the Reduction Premises Fee it owes does not include any portion of the amortized broker's fee paid by Defendant, notwithstanding the language of the lease that calls for such a calculation. Under its interpretation, Plaintiff argues that it owes $110,358.00 for exercising its termination right.

      In Defendant's view, the five year amortization period, which is directly related to the Plaintiff's right to terminate the lease during the latter half of the ten year term—June 1, 2011 to May 31, 2016—similarly spans the second half of the ten year lease, beginning on June 1, 2011. Under this interpretation, if Plaintiff terminates the lease on the first available day of the

termination period, it would have to pay back approximately 100% of the funds that Defendant provided to Plaintiff upfront in the "Cash Allowance" and broker's fee payments. However, the longer Plaintiff stayed during the agreed initial lease term, the lower the termination fee would be if the right was exercised, since the fee was to be amortized on a five year schedule over the last five years of the initial lease term. If Plaintiff chose to terminate the lease during the ninth year of the ten year lease, it would owe a relatively small Reduction Premises Fee, given that the transaction costs would have almost fully amortized (four out of five years). Thus, the Reduction Premises Fee merely operated as a sliding scale fee for which Plaintiff was responsible: the longer it stayed during its agreed lease term, the lower the fee it had to pay for leaving. Under Defendant's interpretation, Plaintiff owes $975,149.00 as a Reduction Premises Fee.

Because the parties could not resolve their differences, Plaintiff filed the instant lawsuit in King County Superior Court seeking, among other things, a declaratory judgment that its interpretation of Article 14.27(d) is correct. Defendant timely removed the case. (Dkt. No. 1.) Plaintiff now moves for summary judgment arguing that (1) the Court cannot consider extrinsic evidence because a contractual integration provision prevents it from doing so; and (2) that as a matter of law, the plain language compels the conclusion that the "five year amortization" period begins when the funds were expended, not during the latter half of the lease term. (Dkt. No. 12.) Defendant, in response, argues (1) that the contractual integration clause does not prevent the Court's consideration of all extrinsic evidence, and (2) that regardless of whether the Court considers such evidence, Plaintiff's interpretation fails because it is not a logical reading of the lease provision and renders portions of the language meaningless. (Dkt. No. 17.) Defendant also offers certain extrinsic evidence and argues that such evidence bolsters its argument that Plaintiff's interpretation does not reflect the parties' intent. (*Id.*) Having reviewed the lease provisions and the parties' motions, the Court disagrees with Plaintiff. First, the Court finds that Article 14.10 does not preclude consideration of any and all extrinsic evidence whatsoever. Second, regardless of the extrinsic evidence issue, the Court finds that contrary to Plaintiff's

arguments, the language in the lease "does not at all" compel the conclusion that Plaintiff's interpretation is correct.

## II. DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In making such a determination, the Court must view the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–50 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non–moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Under Washington law, a court determines the meaning of a lease provision using contract interpretation rules. *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990); *Cargolux Airlines Int'l., S.A. v. Sea-Tac Air Cargo L.P.*, 169 Wash. App. 1009 (Wash. App. 2012). The primary goal of contract interpretation is "to carry out the intent of the parties as manifested, if possible, by the parties' own contract language." *Dep't of Corr. v. Fluor Daniel, Inc.*, 161 P.3d 372, 377 (Wash. 2007) (en banc). Washington follows the objective theory of contracts, under which the court attempts to determine the parties' intent by examining the objective manifestations of the agreement, rather than focusing on the parties' subjective intents. *Hearst Commc'ns, Inc. v. Seattle Times, Co.*, 115 P.3d 262, 267 (Wash. 2005). The words of a contract are to be given

ORDER
PAGE - 5

"their ordinary, usual, and popular meaning, unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.*; *Alvin J. Wolf, Mgmt. Co. v. Bartlett*, 151 Wash. App. 1021 (Wash. App. 2009). The Court also presumes that contracting parties intend that each part of a contract have some meaning and if possible, will reject interpretations that render contractual language meaningless. *Pub. Util. Dist. No. 1 of Lewis Cty. v. Wash. Pub. Power Supply Sys.*, 705 P.2d 1195, 1209 (Wash. 1985) (en banc); *Bogomolov v. Lake Villas. Condo. Ass'n of Apt. Owners*, 131 Wash. App. 353, 361 (Wash. App. 2006). Finally, as Plaintiff notes in its motion, "[w]here one construction would make a contract unreasonable, and another, equally consistent with its language, would make it reasonable, the latter more rational construction must prevail." *Byrne v. Ackerlund*, 739 P.2d 1138, 1143 (Wash. 1987) (en banc) (cited in *Raby v. Onsrud Cutter, LP*, No. C09-0863, 2009 WL 5170187, at *6 (W.D. Wash. Dec. 17, 2009)).

### A.   Extrinsic Evidence

Before turning to Article 14.27(d), the Court addresses the parties' contentions regarding the propriety of considering extrinsic evidence. Ordinarily, a court "may consider evidence extrinsic to the contract itself" for the purpose of determining the intent of the parties, "even when the contract terms are not themselves ambiguous." *Bellevue Square Mgrs., Inc. v. Barceling Continental Corp.*, 157 Wash. App. 1061 (Wash. App. 2010) (citation omitted). Such evidence, if relevant, may include the subject matter of the contract, the circumstances under which the agreement was made, the parties' conduct thereafter, and the reasonableness of the interpretation urged by each. *Hearst*, 115 P.3d at 266; *Berg,* 801 P.2d at 229-30. However, the well-established parol evidence rule applies where an agreement is fully integrated—*i.e.*, contains all terms of the parties' agreement—such as here. Under that rule, extrinsic evidence may not be used to "add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake." *Berg*, 801 P.2d at 230.

Notwithstanding this body of law, Plaintiff argues that Article 14.10 of the lease

precludes the Court from considering any extrinsic evidence whatsoever, thus supplanting established Washington law on the issue. Plaintiff also argues at length that this provision should not be rendered unenforceable as a violation of public policy. Specifically, Article 14.10 of the lease provides:

> **14.10 Integration and Interpretation.** The *terms of this Lease* are intended by the parties as a final expression of their agreement *with respect to such terms as are included in this Lease* and *may not be contradicted* by evidence of any prior or contemporaneous agreement, arrangement, understanding or negotiation (whether oral or written), including without limitation the Prior Lease, between Landlord and Tenant. The parties further intend that this Lease constitutes the complete and exclusive statement of its terms, *and no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Lease*. The language and all parts of this Lease shall in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against any party, regardless of which party may have drafted the provision in question, it being agreed that this is a negotiated instrument.

(Dkt. No. 14, Ex. A.)

In response to Plaintiff's argument that no extrinsic evidence is permissible, Defendant argues that Plaintiff reads the provision "too broadly with absurd results[,]" and asserts that Plaintiff's interpretation "would make it impossible to adjudicate a rent dispute." (Dkt. No. 17 at 17.) Defendant also asserts that Plaintiff itself relies upon certain extrinsic evidence, and lastly argues that if Plaintiff has properly interpreted the provision, it is nonetheless unenforceable as a violation of public policy.

Having reviewed the language of the lease, the Court finds that Plaintiff's interpretation, focused exclusively on the sentence fragment that "no extrinsic evidence whatsoever may be introduced" is too broad and ignores both the context and the other sentences of Article 14.10. Reading Article 14.10 in accordance with its "fair meaning" and as part of a whole, the Court notes that the first sentence speaks directly to the terms contained in the Lease itself, one of which is currently disputed in this matter. That sentence, which addresses what evidence is admissible regarding the terms contained in the lease, provides that those terms are the parties'

1  final expression "with respect to such terms [] *and may not be contradicted by evidence of any*
2  *prior or contemporaneous agreement, arrangement, understanding or negotiation*[.]" (Dkt. No.
3  14, Ex. A.) Accordingly, based on this language, the parol evidence rule is triggered and
4  extrinsic evidence is not admissible to *contradict* the terms contained in the lease. But, to follow
5  Washington law otherwise—to consider such evidence regarding the parties' intent where it is
6  not inconsistent with the terms of the agreement—is still a permissible option. *See Berg*, 801
7  P.2d at 229.
8       The second sentence of the provision, which addresses the full integration of the parties'
9  agreement, is ultimately no obstacle to this outcome. That sentence states that the parties intend
10 the written lease to be an exclusive statement of its terms—*i.e.*, that there are no extrinsic
11 agreements, understandings, or terms other than those contained in the written lease—and "that
12 no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this
13 Lease." (Dkt. No. 14, Ex. A.) When reading the latter sentence segment in the context of the first
14 portion of the sentence, it is clear to the Court that no extrinsic evidence "whatsoever" can be
15 admitted to prove agreements or terms not expressly contained in the lease. Put simply, that
16 sentence fragment relates to the full integration of the agreement and prohibits the "adding to" or
17 "subtracting from" the stated terms, not the interpretation of the terms that are in fact contained
18 in the Lease. Such an interpretation is again consistent with the parol evidence rule. For terms
19 included therein, the first sentence of Article 14.10 indicates that no extrinsic evidence may be
20 used to *contradict* the terms of the agreement.
21      To read Article 14.10 otherwise would be to favor an isolated sentence fragment over the
22 provision as a whole. Indeed, if the "no extrinsic evidence whatsoever" fragment means what
23 Plaintiff suggests, then the first sentence of the provision, which precludes extrinsic evidence
24 from contradicting the terms contained in the lease, would be rendered meaningless and
25 unnecessary. As the parties are aware, the Court avoids such interpretations where possible. *See*
26 *Bogomolov*, 131 Wash. App. at 361 (the court will reject interpretations that render contractual

language meaningless if other interpretations are possible); *see also Berg*, 801 P.2d at 231 (when a provision is subject to two possible constructions, one of which would make the contract unreasonable and imprudent, the Court will adopt the interpretation which is reasonable and just). Here, reading Article 14.10 to permit extrinsic evidence regarding the interpretation of the lease's terms when it is not inconsistent therewith, but excluding all extrinsic evidence "whatsoever" regarding agreements or understandings not contained in the written lease accomplishes this goal. Such a reading is also consistent with the default rules established by Washington law. Had the parties intended an extreme departure from such default rules, as Plaintiff now suggests, they knew, as sophisticated commercial entities, how to draft a provision that clearly stated as much.[1]

### B.   Article 14.27(d) of the Lease

The Court next turns to the parties' disputed interpretations of Article 14.27(d), which establishes the fee to be paid in the event that Plaintiff exercised its right to terminate its tenancy during the latter five years of the lease term. As noted above, Plaintiff "contends that the last sentence [of Article 14.27(d)] requires that the transaction costs be amortized at 8% over a five year term *that commences upon the disbursement of the funds in question by the landlord*." (Dkt. No. 12 at 14) (emphasis added). To support its argument, Plaintiff (1) asserts that the plain language of Article 14.27(d) and the dictionary definition of "amortization" compel such a conclusion; (2) argues that the use of "amortization" elsewhere in the lease similarly compels the

---

[1] The Court also finds persuasive Defendant's argument that consideration of extrinsic evidence is appropriate because Plaintiff itself relied upon such evidence. As Defendant points out, Plaintiff made reference to the context of the negotiations, provided a sworn declaration and exhibits that included correspondence of the parties involving their subsequent calculation of the reduction premises fee and differing interpretations, and speculated as to matters outside the lease which would make their interpretation reasonable, such as Plaintiff's own ability to pay any reduction premises fee under Defendant's interpretation. (*See* Dkt. No. 17 at 18.) Plaintiff's argument in Reply—that Article 14.10 really only precludes extrinsic evidence relating to the meaning of lease terms rather than "any" extrinsic evidence—does not persuade the Court otherwise. Such an argument merely confirms that the portion of Article 14.10 that precludes "any extrinsic evidence whatsoever" is not as absolute a prohibition as it may seem upon first glance. Further, Plaintiff's supporting evidence does shed light on the "meaning" attributed to Article 14.27(d) by the parties, as evidenced by their subsequent conduct and the circumstances of the negotiations.

ORDER
PAGE - 9

conclusion that its interpretation is correct; and (3) repeatedly states that because Defendant's interpretation goes *beyond* the plain language of the lease, its own interpretation is the only correct interpretation.

As quoted above, the disputed portion of Article 14.27(d) provides: "Such transaction costs shall be amortized at 8% over a 5 year term." (Dkt. No. 14, Ex. A, Art. 14.27(d).) The transaction costs to be amortized include the broker's fee paid by Defendant "at or prior to" inception of the lease, as well as the Cash Allowance that Plaintiff could either use on building improvements within the first year of the lease or apply as rent credits. (*Id.*)

Despite its holding above, the Court need not rely on extrinsic evidence to conclude that Plaintiff's interpretation does not reflect the objective intent of the parties. Rather, a review of the agreement's language and structure demonstrates that Plaintiff's interpretation is not a logical reading of the provision, would render portions of the language meaningless, and is inconsistent with the purpose of the Reduction Premises Fee provision. In short, Plaintiff's reading is not a "fair reading" in accordance with the lease as a whole.

At the outset, the Court rejects Plaintiff's flawed argument that its own interpretation is correct because Defendant's interpretation is not expressly spelled out in the text of the lease. Plaintiff repeatedly argues that Defendant's interpretation is erroneous because it "is not at all what the lease says" and "seeks to change the language of the lease." (*Id.* at 1-2.) However, as Plaintiff is undoubtedly aware, it too proffers an interpretation that finds no express support in the text of Article 14.27(d). Further, the fact that Defendant's interpretation is not clearly spelled out in so many words in Article 14.27(d) does not, therefore, make Plaintiff's interpretation—which is similarly lacking in textual support—correct.

Second, the Court is not persuaded that the "dictionary" definition of amortization compels the conclusion that Plaintiff's interpretation is correct. As Plaintiff itself notes, amortization is often defined in two different contexts: as applied to loans and as applied to intangible assets for accounting purposes. In neither context does the definition of amortization

include a statement regarding the immediate triggering of the amortization period; rather, both emphasize that the amortization term is merely for a limited duration. For example, Black's Law Dictionary defines amortization as follows: "1. The act or result of gradually extinguishing a debt, such as a mortgage, usu. by contributing payments of principal each time a periodic interest payment is due. [] 2. The act or result of apportioning the initial cost of a usu. intangible asset, such as a patent, over the asset's useful life." Black's Law Dictionary (9th ed., 2009), "amortization." Nothing in the definition necessarily requires that amortization begin immediately after the debt is created.

Further, the Court also notes that when interpreting a contract provision, a contract's words are to be given "their ordinary, usual, and popular meaning, unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst*, 115 P.3d at 267. Here, even assuming that the "ordinary" meaning of amortization required that that period begin immediately upon the expenditure of funds, the Court finds that the entirety of the agreement—and especially the Reduction Premises Fee provision—demonstrates that use of the term "amortization" in Article 14.27(d) does not support a reading that applies that meaning of amortization. As the parties' arguments make clear, this is not a normal loan or asset to be depreciated for accounting purposes over its useful life. Rather, the term is used in a termination fee provision that is directly related to Plaintiff's ability to withdraw from the lease. The instant scenario is accordingly divorced from the circumstances of the term's regular usage in the loan or accounting context. The contrary intent is also demonstrated, as explained below, by the fact that such a reading would render contractual language meaningless. In such an instance, the agreement itself indicates that amortization need not be given a technical meaning divorced from the provision in which the term is used.[2]

---

[2] Similarly, the Court is not persuaded by Plaintiff's argument that the Reduction Premises Fee is analogous to a loan or an intangible asset. Nor does the Court agree that the use of the term "amortization" elsewhere in the contract, along with an express provision stating that the term begins immediately after the loan is taken down, compels the same conclusion in the instant scenario. As Washington law makes clear, when a term has a technical

Third, the Court presumes that contracting parties intend that each part of a contract have some meaning and, if possible, will reject interpretations that render contractual language meaningless. *Pub. Util. Dist. No. 1*, 705 P.2d at 1209; *Bogomolov*,127 P.3d at 766. Here, Plaintiff's interpretation renders meaningless the portion of the Reduction Premises Fee provision that expressly includes the broker's fee as a transaction cost to be amortized. The reason, of course, as Plaintiff itself acknowledges in a sworn declaration, is that Defendant paid the broker's fee "at or prior to" inception of the lease. (Dkt. No. 14 at 2.) Nor was such an outcome fortuitous. According to Plaintiff's interpretation, the parties necessarily agreed that the broker's fee was a transaction cost that would fully amortize before Plaintiff could exercise its termination right, but nonetheless chose to include it in the language of Article 14.27(d) as part of the fee to be paid. Such an interpretation renders inclusion of the broker's fee as a transaction cost meaningless. Thus, if another interpretation is possible—which the Court believes there to be—it will reject the reading that renders language meaningless.

Finally, without evidence to demonstrate otherwise, Plaintiff's interpretation is unreasonable from a commercial standpoint. If the parties included a Reduction Premises Fee in the lease for the purposes of reimbursing Defendant for its upfront expenditures and incentivizing Plaintiff to remain a tenant through its agreed upon lease term, a reading of Article 14.27(d) which provides that Defendant graciously provided over $1 million with little to no chance of a full recovery, while permitting Plaintiff to break its ten-year lease after five years with no penalty, is not commercially reasonable. Plaintiff offers various speculative reasons to demonstrate why Defendant may have agreed to such a generous proposition, but the Court finds such guesswork unpersuasive. Rather, as Plaintiff is aware, "where one construction would make

---

meaning or is a term of art, the general rule is that such language must be given its technical meaning when used in a transaction *within its technical field*. *Berg*, 801 P.2d at 230. Here, the term "amortization" is not used with reference to an actual loan or for accounting purposes regarding an intangible asset, as it is elsewhere in the lease. Thus, even if Plaintiff's technical reading was correct, the Court finds that the circumstances of the case justify its decision not to rely solely on a technical definition of the term "amortization."

a contract unreasonable and another, equally consistent with its language, would make it reasonable, the latter, more rational construction will prevail." *Byrne*, 739 P.2d at 1143; *see*, *e.g.*, *Raby v. Onsrud Cutter, LP*, No. C09-0863, 2009 WL 5170187, at *6 (W.D. Wash. Dec. 17, 2009) (declining to adopt Plaintiff's proposed construction of a contract provision, pursuant to which Plaintiff would have been granted the ability to terminate his employment at any time while continuing to receive "guaranteed" compensation). Here, the Court finds that Plaintiff's interpretation is not a commercially reasonable reading of the agreement, especially in light of the fact that the parties are both sophisticated commercial entities.

The Court's rejection of Plaintiff's interpretation is only bolstered further by consideration of the limited extrinsic evidence provided by Defendant. As Block 24 explains, the parties negotiated over the Reduction Premises Fee—and specifically, over the length of the amortization period—before executing the ten-year lease. (Dkt. No. 17 at 7-10.) In the course of such negotiations, Plaintiff repeatedly attempted to obtain a *ten*-year amortization term, whereas Defendant sought a shorter five-year amortization period to be used in calculating the Reduction Premises Fee. (*Id.*) Defendant prevailed and a five-year term was used. However, if Plaintiff's proposed interpretation truly reflects the parties' intent, then the parties repeatedly and affirmatively negotiated against their own economic interests. For example, using the actual August 31, 2012 termination date as a basis to demonstrate the parties' sought-after positions, the outcome of their desired positions would have been as follows: (1) A ten-year amortization period would have resulted in a Reduction Premises Fee of approximately $584,000; (2) the Reduction Premises Fee under Plaintiff's current interpretation (a five-year amortization period beginning, for each transaction cost, on the date of expenditure) would be approximately $110,000; and (3) under Defendant's interpretation, that the amortization period is the latter five years of the lease, the Reduction Premises Fee would be approximately $975,000. (Dkt. No. 17, at 22.)

If Plaintiff's interpretation is correct, Plaintiff repeatedly requested a ten-year term—

1  which would have resulted in a $584,000 fee—but rejected Defendant's offer of a five-year term,
2  which it now argues that the parties intended and which would result in a fee of approximately
3  $110,000. Similarly, Defendant rejected the ten-year term and instead repeatedly insisted upon a
4  five-year term that would result in a significantly lower Reduction Premises Fee. (*Id.*) The Court
5  is hard pressed to believe that either party, both of which are sophisticated entities, engaged in
6  such negotiations. Additionally, the Court notes, Plaintiff's former broker, who negotiated the
7  lease on its behalf, called Plaintiff's interpretation of the lease "illogical" and explained that
8  during the negotiations, he understood that the five-year amortization period covered the latter
9  five years of the ten-year lease—*i.e.*, the period during which Plaintiff could exercise its
10 termination right. (Dkt. No. 18 at 4-7.)

11 In light of the above, the Court declines to conclude that Plaintiff's interpretation of
12 Article 14.27(d) reflects the only possible reading of the parties' intent and finds that there is, at
13 a minimum, a genuine dispute of material fact regarding the interpretation of Article 14.27(d).

14 **III.    CONCLUSION**

15 For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 12) is
16 DENIED.

18 DATED this 8th day of January 2013.

*[signature]*

John C. Coughenour
UNITED STATES DISTRICT JUDGE